IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY J. GRAZIANO, et al.,      )
                                  )
                Plaintiffs,       )
                                  )
     v.                           )      No.  03 C 4562
                                  )
VILLAGE OF OAK PARK,              )
                                  )
                Defendant.        )

## MEMORANDUM OPINION AND ORDER

Each of Anthony Graziano ("Graziano"), Sam Calascibetta
("Calascibetta"), Frank Ruscitti ("Ruscitti") and Henry Rybacki
("Rybacki") has charged the Village of Oak Park ("Oak Park") with
one or more of an array of violations of Title VII of the Civil
Rights Act ("Title VII," 42 U.S.C. §§2000e to 2000e-17), the Age
Discrimination in Employment Act ("ADEA," 29 U.S.C. §§621 to 634)
and the Americans with Disabilities Act ("ADA," 42 U.S.C. §§12101
to 12117).  Oak Park has moved for summary judgment on a subset
of those claims under Fed. R. Civ. P. ("Rule") 56.  In
particular, Oak Park seeks summary judgment (1) on all four
plaintiffs' claims that they were unlawfully terminated in
retaliation for conduct protected under Title VII, (2) on
Ruscitti's and Rybacki's Title VII claims that they were
unlawfully terminated due to their national origin, (3) on
Calascibetta's, Ruscitti's and Rybacki's ADEA claims that they
were unlawfully terminated due to age and (4) on Rybacki's claim
(though not formally set out in his Complaint) that he was

subjected to a hostile working environment.[1]

Both sides have nominally complied with this District Court's LR 56.1.[2] For the reasons stated in this memorandum opinion and order, Oak Park's motion (1) is denied as to Graziano's retaliation claim and (2) for the reason stated in the Appendix, is recommended to this Court's colleagues to be granted as to all other claims under consideration.

## Summary Judgment Standards

Familiar Rule 56 principles impose on movant Oak Park the

[1] See Appendix 1.

[2] LR 56.1 is designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements by the moving party and itemized responses to such statements by the nonmoving party (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. "Nominally" has been used in the text because, as to plaintiffs, Oak Park's R. Mem. 3-4 (photocopy attached) identifies an astonishing level of noncompliance by plaintiffs' counsel with the LR 56.1 requirements. Although our Court of Appeals has repeatedly approved a stern response to such subversions of that rule's basic purposes (see, e.g., Cichon v. Exelon Generation Co., 401 F.3d 803, 808-10 (7th Cir. 2005) and Ammons v. Aramark Unif. Servs., 368 F.3d 809, 816-18 (7th Cir. 2004) and other cases cited in those opinions), this opinion will not adopt the draconian approach urged by Oak Park, which would essentially junk the responses to Oak Park's LR 56.1 submission and thereby necessarily eliminate any possibility that material factual issues might preclude summary judgment. At the same time, the identification in this opinion of some outright misrepresenta-tions of the record on plaintiffs' behalf, as well as some lesser departures from LR 56.1 principles, is only representative of numerous other examples that would unduly lengthen this already oversize opinion. Suffice it to say that a permissibly vigorous judicial response to plaintiffs' submission would make this an even easier case for upholding Oak Park's entitlement to summary judgment on all but a single claim--that advanced by Graziano as to claimed retaliation.

2

burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party ... and draw all reasonable inferences in his favor" (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). This general standard is also applied with rigor in employment discrimination cases, where intent is inevitably the central issue (McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 370-71 (7th Cir. 1992)). That said, to avoid summary judgment a nonmovant still "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)). In the end, though, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the facts viewed in the light most favorable to the plaintiffs, but only so long as those facts are supported by record evidence.

In that respect, as reflected in n.2, in Appendix 2 and at pages 2 and 3 of Oak Park's Response to Plaintiff's LR 56.1(b)(3)(B) Statement of Additional Facts, Oak Park has identified a number of substantial defects in plaintiffs' LR 56.1(b)(3)(A) response to Oak Park's LR 56.1(a)(3) statement of material facts. Those comprise plaintiffs' admission of many of

the material facts in Oak Park's statement (either directly or by incomplete denial), their "argumentative denials and extraneous information" in their own responsive statement, their reliance on unsupported and immaterial assertions and hearsay and their submission of affidavits directly contradicting their own deposition testimony. And as n.2 indicates, the factual recitation in this opinion gives plaintiffs substantially more than their due--and despite that, all but one of their claims succumb under the Rule 56 standards.

## Background

Oak Park is an incorporated municipal entity just west of Chicago, Illinois (OP St. ¶5).[3] It is governed ultimately by an elected Village President and Board of Trustees (id. ¶12), but the daily operation of government services and programs is overseen by the Village Manager (id.). All four plaintiffs were employed by the Streets Division of Oak Park's Public Works

---

[3] This opinion cites to Oak Park's LR 56.1(a)(3) Statement of Material Facts as "OP St. ¶ --," to plaintiffs' LR 56.1(b)(3)(A) response to that statement as "P. R.St. ¶--" and to plaintiffs' LR 56.1(b)(3)(B) statement of additional facts as "P. Add.St. ¶--." In addition, this opinion cites to Oak Park's initial Memorandum of Law as "OP Mem. --," to plaintiffs' responsive Memorandum of Law as "P. Mem. --" and to Oak Park's Reply Memorandum as "OP R. Mem. --." Finally, this opinion refers to particular complaints ("Cmplt. ¶--") and answers ("Ans. ¶--") by the appropriate party's name, to plaintiffs' and defendant's exhibits as "P. Ex. --" and "OP Ex. --" respectively and to affidavits ("Aff. ¶--") and depositions ("Dep. --") by the Appendix in which the record is found and by the subject's name (e.g., "App. I, Ruscitti Dep. 6").

4

Department ("Streets Division"): Graziano, Ruscitti and Rybacki as "equipment operators" and Calascibetta as Maintenance Crew Chief ("Crew Chief") (id. ¶24; Graziano Ans. ¶12; Ruscitti Ans. ¶13; Rybacki Ans. ¶16; App. III, Graziano, Ruscitti and Rybacki Aff. ¶1).

While the bulk of the saga portrayed in these cases played out during and after the summer of 2002, two preliminary events should be noted to set the stage properly. First, in 1992 Calascibetta filed an employment discrimination claim against Oak Park with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights (OP St. ¶180). That claim, which alleged that Calascibetta was denied a promotion because of his age, was settled in 1998 (id. ¶¶180-81). Second, in early 2002 newly- hired Oak Park Human Resources Director Frank Spataro ("Spataro") began to investigate the amount of overtime being performed by Streets Division employees (id. ¶¶37-38). Based on his findings, Spataro eventually concluded (among other things) that Calascibetta had manipulated overtime assignments for the benefit of himself and a few select employees (id. ¶174).

It was in the midst of that overtime investigation that the Streets Division entered into what would soon become a divisive morass of accusations and counter-accusations, investigation and counter-investigation and feuding blocs of employees. That was

5

catalyzed by Oak Park's May 2002[4] receipt of an anonymous letter (the "Speciale Letter") that charged Calascibetta and one of his superiors, Public Works Operations Superintendent Anthony Speciale ("Speciale"), with abusing their positions and failing to fulfill their duties (OP St. ¶¶19, 59-60). Rumors soon began circulating among Streets Division employees as to the authorship of the Speciale Letter (id. ¶61). In June two Streets Division employees, Mike Otters ("Otters") and Charles Vetro ("Vetro"), complained to Spataro that Calascibetta and Streets Division Supervisor Jim Hirakawa ("Hirakawa") had accused them of writing the letter and that Calascibetta and Hirakawa had retaliated against them for their alleged authorship (id. ¶¶67-71). Along with a third co-worker, Mike Pepe ("Pepe"), Otters and Vetro further reported that Calascibetta had changed their overtime assignments and job responsibilities (id. ¶¶70, 71, 73), had favored certain employees (id. ¶¶74-76) and had failed to do his own assigned work (id. ¶77).

In August Spataro began an investigation of those complaints (OP St. ¶¶83-84). In the course of that investigation, Spataro received numerous reports of asserted misconduct by Ruscitti, Calascibetta and Graziano.

For example, there was a whole battery of complaints about

---

[4] Because most of the events relevant to this opinion took place later in 2002, that year reference will be omitted hereafter in recounting those events.

6

Ruscitti. Employees told Spataro that Ruscitti (1) had referred to a fellow employee as "Lassie," whistled to call him "like a dog" (OP St. ¶109) and referred to him as a "fucking retard" (id. ¶115), (2) had made another employee "stick his face out of the truck and act like a dog" (id. ¶112), (3) had denied fellow employees a water break (id. ¶113), (4) had attempted to discourage another employee from reporting Ruscitti's misconduct and had referred to that employee as a "fucking pussy" for doing so (id. ¶116), (5) unlike other employees, would not stop teasing co-workers when asked (id. ¶117), (6) when confronted about his disappearances from the worksite by a summer co-worker, had stated "I'm the boss and you are just the temp--that's what happens when seasonals come--its time for the full-timers to get the summer off. I'm the boss" (id. ¶119), (7) had urged co-workers to work slowly to create more overtime opportunities (id. ¶121) and (8) had avoided assigned work (id. ¶120).

As to Calascibetta, in addition to the reported behavior that had prompted the investigation to begin with, Spataro was also told (1) that Calascibetta was advising Streets Division employees not to talk to Spataro without a union representative present and (2) that one of Spataro's goals in the investigation was to get the employees to forfeit future union representation (OP St. ¶134). Spataro saw that as a further example of an ongoing attempt by Calascibetta to keep his co-workers from

voicing their concerns about him (id. ¶135).

Finally, as to Graziano, the complaints about his conduct centered around a single incident that occurred in the midst of Spataro's investigation. On the morning of August 22 Graziano left a Dunkin' Donuts box in the break room of the Public Works department (OP St. ¶137). When Pepe, Otters and Vetro opened the box, they found three pieces of individually wrapped cheese (id. ¶138). Viewing that as a symbolic act of retaliation--that the cheese had been intended for them as "rats"--Pepe, Otters and Vetro again complained to Spataro (id. ¶139). On August 27 a hearing was held, during which Graziano argued that instead of the cheese having been intended to send any message, he had simply been saving it to take home for his son after his shift was over (id. ¶191). Disbelieving that explanation, on September 5 Spataro prepared a memorandum recommending that Graziano be suspended for a week as punishment for his "use of abusive language or manner toward one's fellow employees" and for retaliating against fellow employees for reporting misconduct (P. R.St. ¶195; P. Ex. 19).

Graziano, Rybacki and Ruscitti were not the only Streets Division employees complained of, however. In fact, each of them reported to Spataro that Vetro, Otters and Pepe had themselves been the perpetrators of harassment and other misconduct (P. R.St. ¶85). They further reported that as soon as they began

8

that report, Spataro "put down his pen and took no notes" (id. ¶78). Spataro did record, however, that African-American employee Walter Frazier ("Frazier") had heard Otters make offensive comments and considered him "a racist" (OP St. ¶100).[5]

Seeing no action taken on their own allegations of harassment and misconduct, Graziano, Rybacki and Ruscitti also spoke to Hirakawa, who together with Director of Department of Public Works Joe Euclide ("Euclide") then launched an independent inquiry into those counter-allegations (OP St. ¶141). That began on September 5 with interviews of Rybacki, Graziano, Ruscitti and three other Streets Division employees (id. ¶¶141, 143). During those interviews Graziano complained about some colleagues' references to Frazier as a "nigger" and as "defin[ing] a lazy blackman [sic]," noting that Otters in particular was a "prejudice [sic] individual" (P. Ex. 33, D000885, D000887).

When Spataro learned of the parallel Hirakawa-Euclide inquiry on September 9, he informed Oak Park Village Manager Carl Swenson ("Swenson") of what was going on (OP St. ¶¶144-45). Swenson immediately ordered that the separate and not-officially-authorized inquiry be stopped and that all interview materials be turned over to Spataro and Oak Park Attorney Raymond Heise

---

[5] That said, Frazier also noted, as did other employees, that rough "shoptalk" including racial and ethnic slurs, while common in the workplace, was usually used in a joking or teasing manner (OP St. ¶¶103-07).

("Heise")(id. ¶145).[6]

Shortly after the halting of the Hirakawa-Euclide inquiry, Spataro authored recommendations that Graziano, Calascibetta and Ruscitti be terminated. Those recommendations came in two stages.

First, on September 11 Spataro issued a recommendation that, rather than the suspension he had originally favored, Graziano be terminated (P. Ex. 20). In support of that new recommendation Spataro pointed first of all to the original charges stemming from the cheese incident itself: Graziano's violation of Oak Park's anti-retaliation policy and his use of "abusive language or manner" toward co-workers (OP St. ¶189; P. Ex. 20). Unlike the September 5 suspension memorandum, however, the new recommendation also stated that in going to get doughnuts on the morning of the cheese incident (doughnuts whose box would, hours later, hold the three slices of cheese) Graziano had (1) overrun his allotted break time, (2) left the job site without permission and (3) used an Oak Park vehicle for personal reasons (OP St. ¶190; P. Ex. 20). On October 3, after Spataro had briefed him, Assistant Village Manager M. Ray Wiggins ("Wiggins") authorized Graziano's termination (P. R.St. ¶¶193, 196).

---

[6]   Although plaintiffs argue that the information was not in fact given to Spataro, but only to Heise (P. R.St. ¶145), this Court has adopted Oak Park's version, which suggests that Spataro too was aware of the content of the interviews. That scenario is actually more helpful to plaintiffs, as discussed below.

Second, on October 2 Spataro also issued letters informing Ruscitti and Calascibetta that he was recommending their termination (OP St. ¶¶173, 197). In Ruscitti's case Spataro set forth several justifications for his recommendation, stating that Ruscitti (1) had used abusive language or manner toward his fellow employees, (2) had avoided work while on the job, (3) had imposed work restrictions and conditions on other employees without authority and (4) had purposely slowed down work to create overtime opportunities (id. ¶198). In Calascibetta's case Spataro noted that he (1) had discouraged employees from taking part in Spataro's investigation, (2) had contributed to divisiveness in the Streets Division by accusing Vetro and Otters of writing the Speciale Letter and indirectly blaming them for the decline in overtime, (3) had failed to perform fieldwork and had been ineffective in his role as Crew Chief and (4) had manipulated overtime assignments to benefit himself and select employees (id. ¶174).

On October 3 Wiggins, who had been delegated the termination authority by Swenson, authorized Calascibetta's termination on the basis of the information and recommendations provided by Spataro (id. ¶¶178-79). Ruscitti's termination became final on October 9, after he had repeatedly declined opportunities to contest Spataro's recommendation (id. ¶¶199-203).

Unlike his co-plaintiffs, Rybacki managed to survive the

11

Streets Division turmoil of the summer and fall of 2002 relatively unscathed (or at least still in possession of his job).[7] But beginning in early 2003 Rybacki began to have "disagreements" with Vetro, who had been promoted to Acting Crew Chief when Calascibetta was terminated (OP St. ¶¶206, 212), and to be subjected to a number of work-related changes.

First, Vetro reduced the amount of time allotted for Rybacki to clean and maintain his machine to 15 minutes--an amount of time that Vetro understood from the machine's vendor to be adequate and to which the union contract stipulated, but that Rybacki felt was insufficient (id. ¶¶213-220). On another occasion Vetro assigned Rybacki to equipment that aggravated his back (P. R.St. ¶224). In addition, Rybacki's machine was vandalized, including the dangerous removal of integral parts (OP St. ¶232). Further, Rybacki was required to ask permission to go to the bathroom, was followed to the bathroom and was required to get a physical exam (P. R.St. ¶236; OP St. ¶236).

Rybacki wrote two letters of complaint regarding those incidents, the second being dated April 22, 2003 (OP St. ¶¶232, 236). Neither letter was responded to (P. R.St. ¶¶233, 241).

---

[7] Rybacki did complain to both Spataro and Hirakawa about general harassment in August and September 2002 (P. R.St. ¶85; P. Ex. 33, D000898-99), and he even appears to have filed an EEOC charge based on age harassment in November 2002 (Rybacki Cmplt. ¶31). Unlike his co-plaintiffs, however, the bulk of Rybacki's evidence and the focus of his arguments concern events that occurred in the months following the October 2002 terminations.

Finally, on February 9, 2004 Rybacki retired from Oak Park employment, citing stress-related health problems (id. ¶241).

## Threshold Nonissues

As our Court of Appeals has repeatedly held (see, e.g., CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 677 (7th Cir. 2001)), a party opposing summary judgment cannot simply "rest on the pleadings" but must come forward with some evidence (more than a "mere scintilla") in support of his or her claim to avoid dismissal. In this case plaintiffs' responsive memoranda plainly appear to have abandoned some of their original claims, so that they have failed to satisfy the threshold minimum requirement as to those claims.

First, although plaintiffs Ruscitti and Rybacki included claims of national origin discrimination in their complaints (Ruscitti Cmplt. ¶¶21-36; Rybacki Cmplt. ¶¶43-54), they offered neither argument nor evidence in support of those claims in their memoranda, in their LR 56.1(b)(3)(A) Response to Oak Park's Statement of Material Facts or in their LR 56.1(b)(3)(B) Statement of Additional Facts.[8] Similarly, plaintiff Rybacki has

---

[8]    Oddly, Oak Park includes in its memorandum of law an argument as to why summary judgment is warranted for a claim of national origin discrimination by Graziano (OP Mem. 16-18), even though Graziano's complaint contained no such claim (Graziano Cmplt. ¶¶1-28). But in any case, because plaintiffs' filings include no evidence of any such discrimination anyway, whatever national origin claim Graziano might have made is also defeated by Oak Park's summary judgment motion.

failed to pursue the claims of age discrimination and retaliation that he originally advanced in his complaint (Rybacki Cmplt. ¶¶13-42, 43-44).[9] Instead, his memorandum of law focuses solely on a claim of hostile work environment (P. Mem. 18-20).

It is not this Court's responsibility to fashion arguments for the litigants when they have not done so themselves. Given their failure to meet the most basic evidentiary requirement of summary judgment, Ruscitti's and Rybacki's claims of national origin discrimination and Rybacki's claims of age discrimination and retaliation all fail to survive the current summary judgment motion. It is therefore recommended that those claims be dismissed with prejudice.

## Retaliation

Each of Ruscitti, Graziano and Calascibetta claims that Oak Park violated Title VII by firing him in retaliation for his complaining about unlawful workplace discrimination and/or harassment. Any plaintiff asserting such a retaliation claim may employ one of two legal frameworks to pursue the claim: the direct method and the indirect method (Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903 (7th Cir. 2005)).

Here plaintiffs have chosen the direct method, which requires a plaintiff first to provide at least reasonable

---

[9] Rybacki's Complaint misnumbers its paragraphs. Its "Count Four" sets out his retaliation claim.

inferences that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action taken by the employer and (3) there is a causal connection between the two (Culver v. Gorman & Co., 416 F.3d 540, 545 (7th Cir. 2005)). Once plaintiff does so, summary judgment against him should be granted only if defendant then "presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive" (id. at 546, quoting Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir. 2002)).

In this instance Oak Park acknowledges that each plaintiff did in fact suffer an adverse employment action (termination) and contests only the remaining two elements of each plaintiff's case: his engagement in protected conduct and the existence of a causal link between such conduct and his termination. This opinion addresses each of the three retaliation claims in turn.

## Ruscitti

Ruscitti contends that he engaged in protected conduct by complaining of discriminatory activities within the Streets Division. To qualify as protected conduct, such complaints must target some action that is in fact prohibited by Title VII (see Sitar v. Ind. Dep't of Transp., 344 F.3d 720, 727 (7th Cir. 2003)). For example, simply complaining of people being "picked on" without charging a discriminatory motivation (such as a race-

15

based or sex-based motive) does not qualify as protected conduct
(see id.). And even if a plaintiff's grievance has indeed
challenged Title-VII-prohibited activity, he or she must also
make that complaint "in good faith and with a reasonable and
sincere belief that he or she is opposing unlawful
discrimination" (Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090,
1096 (7th Cir. 1998)).

Here Ruscitti points to almost no evidence that he objected
to such prohibited action. Though he claims to have complained
generally about "harassment" during Spataro's interviews (P.
R.St. ¶85), this Court has been given no notes from those
interviews,[10] so there is no way of knowing just what his
complaints entailed.[11] Ruscitti also claims to have "discussed"
age discrimination with Calascibetta (P. Mem. 14), but again he
refers to no admissible evidence of his making any such complaint
to Calascibetta, let alone to evidence of any problematic nature
of that complaint.

Ruscitti's only submission as to just what he was
complaining about comes from notes from the Hirakawa-Euclide

[10] By contrast, notes of Spataro's interviews of other
employees have been identified in the parties' submissions.

[11] Ruscitti refers only to his affidavit, which merely re-
states that he complained to Spataro of "harassment of
employees," without saying what sort of harassment he was
complaining about (P. R.St. ¶¶78, 85; App. III, Ruscitti Aff.
¶2). That is clearly inadequate to the task.

16

interviews (P. R.St. ¶148; P. Ex. 33, D000895-96). But those notes demonstrate that the overwhelming focus of Ruscitti's complaints was on safety violations and vandalism, activities that--while likely violating Oak Park rules--have no relevance to a Title VII claim (P. Ex. 33, D000895-96). In fact, Ruscitti's complaints include only one potential reference to illegal harassment (and one that was directed not at Ruscitti himself but at a fellow employee): the claim that Otters "calls [a co-worker] 'old man'" (P. Ex. 33, D000896).[12] Any such isolated and tangential reference, adverted to only in the midst of a general complaint that really focused on conduct not prohibited by Title VII, cannot qualify as actionable protected conduct (see <u>Miller v. Am. Family Mut. Ins. Co.</u>, 203 F.3d 997, 1007-08 (7th Cir. 2000).[13]

---

[12] There is also a reference in the Hirakawa-Euclide notes to a sexual-orientation-based statement, but discrimination based on sexual orientation is not prohibited under Title VII (<u>Schroeder v. Hamilton Sch. Dist.</u>, 282 F.3d 946, 951 (7th Cir. 2002)).

[13] This determination is based on what is said in the text of this opinion, not on Oak Park's argument that complaints made during the Hirakawa-Euclide inquiry cannot count as protected conduct because that investigation was a "sham" (OP R.Mem. 16-17). Again the key question is whether Ruscitti made his complaints in good faith and with a reasonable belief that he was opposing illegal employment action. Even if those running the inquiry might merely have been trying to "save their own jobs" and to discredit Vetro, Otters and Pepe (rather than legitimately investigating workplace discrimination and harassment), that would not necessarily preclude Ruscitti from having such a reasonable belief and from taking part in the inquiry in good faith.

Moreover, Ruscitti has failed to demonstrate a sufficient causal link between any assertedly protected conduct and his termination. To be sure, the rarity of overt admissions that an employee was fired due to his or her protected conduct has properly led our Court of Appeals to allow plaintiffs to rely instead on circumstantial evidence that would allow a factfinder to infer the required causal link (see, e.g., Mannie v. Potter, 394 F.3d 977, 983 (7th Cir. 2005); but see Hudson v. CTA, 375 F.3d 552, 560 (7th Cir. 2004)). But here Ruscitti fails to meet even that less rigorous test, for all he does is to point to the single circumstance that he was fired four weeks after his assertedly protected conduct. It is well established that "suspicious timing alone rarely is sufficient to create a triable issue" as to causation (Moser, 406 F.3d at 905), and courts regularly require additional evidence.

So Ruscitti fails to satisfy his prima facie case of retaliation. This Court recommends that Oak Park also prevail on its summary judgment motion as to that claim.

## Graziano

As with Ruscitti, the best evidence of Graziano's assertedly protected conduct comes in notes from his Hirakawa-Euclide interview. But in contrast to Ruscitti's situation, those show that Graziano's complaints substantially targeted activity that could reasonably be viewed as prohibited by Title VII.

For example, Graziano noted that Otters referred to Frazier as "defin[ing] a lazy blackman [sic]" and a "nigger" and that he had referred to Polish co-worker as a "Pollock" (sic)(P. Ex. 33, D000885, D000887). Indeed, Graziano's reports about Otters' treatment of Frazier are echoed by Frazier's own reports of race-based harassment (particularly by Otters and Vetro): Frazier told Spataro that Vetro referred to him as "Buckwheat," that co-workers spoke of getting "the pickup truck and the chain" for him (referring, Frazier understood, to the Texas race-based murder of an African-American by dragging him behind a truck) and that Otters spoke of "getting the rope and tree ready" (P. Ex. 12, D000781). Such activity would surely support a reasonable and good faith complaint that Title VII violations were occurring in the Streets Division workplace (see, e.g., Walker v. Mueller Indus., Inc., 408 F.3d 328, 330, 331 (7th Cir. 2005)). Unlike Ruscitti's tangential reference to a stray "old man" remark, Graziano's complaints suffice to qualify as protected conduct.

Although this opinion speaks of Graziano's complaints as "protected conduct," those references should not be misunderstood as somehow endorsing what is really an unproved proposition in that respect. It should always be remembered that the race-based comments adverted to by Graziano were not only voiced by fellow workers rather than by anyone engaged in the decisionmaking process that affected Graziano, but were also directed at other

19

fellow employees that were members of a Title VII protected class that did not include Graziano. In that regard <u>Walker</u>, 408 F.3d at 331 cautions:

> [A]s the district court recognized, this court's opinion in <u>Bermudez</u> [<u>v. TRC Holdings, Inc.</u>], 138 F.3d [1176,] 1180-81 [(7th Cir. 1998)], all but closes the door on the notion that an employee who observes workplace hostility but is not a member of the class of persons at whom the harassment was directed may bring a derivative claim for the harassment. We say "all but" because, after noting an even split among the judges of the Fourth Circuit on this question in <u>Childress v. City of Richmond, Va.</u>, 134 F.3d 1205 (4th Cir. 1998)(en banc), we concluded our discussion in <u>Bermudez</u> with the qualification that "[w]e need not come to rest on the subject today..." 138 F.3d at 1181. Instead, we proceeded to reject the hostile environment claim for lack of proof that the harassment "poisoned the working atmosphere" for the plaintiff. <u>Id.</u>[14]

As was true of the plaintiffs in both <u>Bermudez</u> and <u>Walker</u>, Graziano has plainly struck out on any showing that the fellow workers' comments poisoned his own working environment. But because <u>Walker</u>, 408 F.3d at 332-34 segued into an analysis of the plaintiff's claim of retaliation without discussing the predicate for treating an employee's nonactionable discrimination claim as supporting an actionable claim for retaliation after the employee had referred to some discriminatory language targeting others in

---

[14] [Footnote by this Court] It must be said that the just-quoted reading of <u>Bermudez</u> does not fully capture the tone of that opinion, which was really hostile to such derivative claims of hostile employment environments.

the workplace, this opinion will proceed in the same fashion.[15]

On that score Graziano has offered enough evidence to raise a factual issue as to the required causal link between the assertedly protected conduct (his references to race-based comments) and his termination. First, the temporal gap between Graziano's conduct and Spataro's decision to recommend his termination is suspiciously short: Spataro learned of the Hirakawa-Euclide interviews on September 9 and wrote the memorandum recommending termination on September 11. Admittedly (as quoted earlier) "suspicious timing alone rarely is sufficient to create a triable issue" (Moser, 406 F.3d at 905). But here the time gap is strikingly short: a mere two days. Though not enough on its own, such tight temporal sequence is certainly "an important evidentiary ally of the plaintiff" (Lalvani v. Cook County, 269 F.3d 785, 790 (7th Cir. 2001)) and of "major significance" in establishing causation (Culver, 416 F.3d at 546).

This opinion, like the parties themselves, has focused on Spataro's conduct in that respect. Normally, of course, a plaintiff must show that the adverse decisionmaker had the prohibited retaliatory motive (Rogers v. City of Chicago, 320

---

[15] Because the result reached here will preserve Graziano's retaliation claim for future resolution, the assumptions made in this opinion may of course be revisited if later caselaw developments call for reconsideration.

21

F.3d 748, 754 (7th Cir. 2003)), and in this case it is undisputed that Wiggins and not Spataro was the decisionmaker (see OP St. ¶196). But there is ample authority for the proposition that even when the decisionmaker is unaware of a plaintiff's protected conduct, a showing that a non-decisionmaking employee with "discriminatory animus" had major input into the adverse employment decision (either controlling or perhaps affecting that decision) will preclude summary judgment (Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 512 (7th Cir. 19998), citing Dey v. Colt Const. & Dev. Co., 28 F.3d 1446, 1459 (7th Cir. 1994)).

Here Graziano has certainly presented evidence that Spataro had input into Wiggins' termination decision: He briefed Wiggins before the latter reached the final determination as to Graziano's termination. That suffices to create the required inference (as the parties appear to have drawn as well) that the linkage in time of Spataro's termination recommendation to his having learned of Graziano's comments on September 9 satisfies the causation element of Graziano's prima facie case.

Graziano does not rely on temporal proximity alone. In addition, and more powerfully, Graziano notes that the only significant event that might account for Spataro's abrupt disciplinary change of heart was his discovery of the Hirakawa-Euclide interviews. On September 5 Spataro felt the appropriate punishment for Graziano's conduct in the cheese incident was a

22

modest one-week suspension. Yet by September 11 he decided that suspension was not strong enough and that outright termination was warranted. There were no further meetings with Graziano during that period (in which perhaps new inculpatory information might have been gleaned), nor were there any new violations of Oak Park rules or any other event that might have given Spataro cause to change his recommendation. Instead the record reveals only one event that occurred between those two recommendations: Spataro's learning of Graziano's statements. Indeed, even when given the opportunity to supply an alternate legitimate justification for amending his recommendation, Spataro pointed to no particular watershed event, but simply said that he had "reconsidered" Graziano's actions in the interim (App. I, Spataro Dep. I 166-68).

There is the further fact that Spataro's September 11 termination recommendation suddenly added new charges against Graziano: that he had violated additional Oak Park rules in going to get doughnuts on the morning of the cheese incident (P. Ex. 20, D001540-41). That could cut either way in the analysis: On the one hand the added charges could be viewed as validating the termination recommendation by providing a reason for Spataro's upping the ante, while on the other hand Spataro had already known of Graziano's trip to get the doughnuts (which had taken place on August 22) when he wrote his initial September 5

23

memorandum recommending the one-week suspension. But in the summary judgment context, Graziano is entitled to invoke the latter fact as the basis for an inference that Spataro's termination recommendation was solely attributable to Graziano's complaints.[16]

Finally, Graziano observes that when he first complained to Spataro of Vetro's and Otters' inappropriate conduct, Spataro "put down his pen and took no notes." Co-workers Ruscitti and Rybacki observed the same response from Spataro. Although that took place a few weeks before Spataro's change of heart, it could be viewed by a factfinder as suggesting an underlying hostility to Graziano's complaints of harassment, casting further doubt as to the motivation for Spataro's termination recommendation.

In sum, given the combination of the strikingly small temporal gap between the presumptively protected conduct and the termination recommendation, the fact that learning about that conduct was the only intervening event that might explain Spataro's abrupt change of heart in his recommendation, the sudden and belated addition of new charges and what could be seen as Spataro's underlying hostility toward Graziano's complaints, a factfinder could well draw an inference that Spataro's

---

[16]  Indeed, Spataro himself, when given the chance, conspicuously did not identify the new charge as a reason for amending his recommendation (App. I, Spataro Dep. I 166-68).

24

termination recommendation was due to Graziano's complaints.
Hence Graziano also satisfies the causation element of his prima
facie case.

Having thus surmounted the first hurdle--the submission of a
prima facie case--under the direct method, Graziano is entitled
to prevail against Oak Park's Rule 56 motion unless Oak Park "can
produce uncontradicted evidence that [it] would have fired the
plaintiff anyway" (Stone, 281 F.3d at 643). "Uncontradicted"
means that for Oak Park to win at the summary judgment stage
Graziano must fail to have raised a triable issue as to whether
Oak Park's proffered reasons were pretextual (see Culver, 416
F.3d at 546-548). Because the reasons that Spataro cited in his
memo recommending termination are facially legitimate, the
question boils down to pretext vel non.

Resolution of that question does not permit merely second
guessing the employer's personnel decisions (see, e.g., Culver,
416 F.3d at 547). Instead the inquiry asks whether, with
reasonable inferences drawn in the employee's favor, a factfinder
could legitimately find the absence of an honest belief on the
employer's part that the reasons it has advanced justified the
adverse employment action (id. at 547-48). To that end, while
the reasonableness of a given employment decision is not at issue
as such, it can often shed light as to the honest reliance (or
its absence) on a purported justification (Firestine v. Parkview

25

Health Sys., 388 F.3d 229, 236 (7th Cir. 2004)). And here Graziano has raised enough doubt about the sincerity of Spataro's justifications to prevail in this final step of the analysis.

In many cases evidence that supports a plaintiff's prima facie case also supports his or her showing of pretext (see, e.g., this Court's opinion in Farrow v. Humana Health Plan, Inc., 69 F.Supp.2d 1050, 1061 (N.D. Ill. 1999)). Thus logic suggests that evidence that raises an inference of a causal link between protected conduct and an adverse employment action can often, if not always, also raise an inference that whatever facially legitimate justifications the employer may have offered are really pretextual.

Graziano's case is a good example of that sort of overlap. All of the already-discussed factors that give rise to an inference of the causal link required to firm up Graziano's prima facie case also support an inference of pretextuality in Spataro's claimed justifications for recommending termination. In short, Oak Park's summary judgment motion as to Graziano's retaliation claim must be denied.[17]

---

[17] That being said, this opinion will not prolong matters by detailing Graziano's evidence that may cast a further cloud on the bona fides of Spataro's assertion of additional justifications for his recommendation. Those matters may be adduced for evaluation by the factfinder at trial.

Calascibetta

Unlike its approach regarding Ruscitti and Graziano, Oak Park does not dispute that Calascibetta engaged in protected conduct (in his case, by filing an age discrimination complaint with the EEOC in 1992). Instead the only element of Calascibetta's prima facie claim in dispute is whether he has demonstrated a causal link between that conduct and his termination. On that score, what little purported evidence of causation Calascibetta provides is plainly insufficient.

To begin with, the extended temporal gap between Calascibetta's filing of his EEOC claim and his termination severely undercuts Calascibetta's claim. Even if it were to be assumed (as Calascibetta argues) that the relevant date for measuring that gap was not his 1992 filing date but the settlement date of August 4, 1998, that still leaves more than a four-year interval between that date and Calascibetta's termination. While a short time span intervening between protected conduct and adverse employment action can help to raise an inference of causation, a protracted gap can actually be "counter-evidence of any causal connection" (Johnson v. Univ. of Wis.-Eau Claire, 70 F.3d 469, 480 (7th Cir. 1995), disavowed in a wholly unrelated respect in Spiegla v. Hull, 371 F.3d 928, 941-42 (7th Cir. 2004)). That is surely the case here.

As for any affirmative evidence of causation, Calascibetta

27

fails even in inferential terms. Essentially he relies on statements made by Euclide about Heise's and Swenson's disapproval of Calascibetta's 1992 EEOC filing. First, Calascibetta refers to Euclide's deposition, claiming that it states that "based on [Euclide's] discussions with Swenson, Calascibetta would not be considered" for an available supervisor position "in part because Calascibetta had filed the previous charge of discrimination" (P. Add.St. ¶5). But an actual look at Euclide's deposition reveals that he really stated only his opinion that Calascibetta was not being considered for the position for that reason (among others) (App. III, Euclide Dep. 40).[18] If that were somehow sought to be offered as evidence of Swenson's view, it would be inadmissible hearsay and hence a nullity under Rule 56(e)--and alternatively, as a statement of speculative opinion on Euclide's part it could not produce the "genuine issue for trial" needed to defeat summary judgment (see Jordan v. Summers, 205 F.3d 337, 343-44 (7th Cir. 2000)).

Calascibetta also claims in his own deposition that Euclide told him that Swenson and Heise had told Euclide that "they did not appreciate individuals who filed age--frivolous age discrimination claims" (App. I, Calascibetta Dep. I 285-86). As

---

[18] That is but one example of the distressing nature of the LR 56.1-violative submissions by plaintiffs' counsel, as discussed earlier in n.2 and then in the section on Summary Judgment Standards.

the awkwardness of the preceding sentence suggests, that involves multiple levels of potential hearsay. While Calascibetta rightly says that statements made by Heise and Swenson would be nonhearsay under Federal Rule of Evidence ("Evid. Rule") 801(d)(2)(D), he has not shown that Euclide's statements about statements by Heise and Swenson would qualify. For that purpose Euclide would have to have been "acting within the scope of [his]...employment" (Evid. Rule 801(d)(2)(D)) in saying that to Calascibetta, and the record does not necessarily show that.

But even if that evidence were assumed to be admissible as nonhearsay, it still would not help Calascibetta's efforts to demonstrate causation. Whenever Heise and Swenson assertedly made those statements to Euclide (something not indicated by the record), they are wholly without probative value because neither author played any role in the decision to terminate Calascibetta, nor did they provide any input that could qualify under the principle discussed earlier regarding Spataro's conduct vis-a-vis Graziano.

To the contrary, Calascibetta has stipulated to Oak Park's contention that the termination decision "was delegated by Village Manager Swenson to the Assistant Village Manager Wiggins and that Wiggins made the decision based on information and recommendations provided by Spataro" (OP St. ¶178 and P. R.St.¶178). Nor does Calascibetta dispute that Spataro, who

29

concededly had the crucial input into the decision, had no knowledge of Calascibetta's earlier EEOC filing at the time he recommended his termination (OP St. ¶180; P. R.St. ¶180).

In the end, then, Calascibetta has presented no evidence that anyone involved in the decision to terminate him was influenced by his protected conduct. Hence Calascibetta has also failed to establish all of the elements of his prima facie case. As with Ruscitti, this Court holds and recommends that Oak Park should prevail in its summary judgment motion on that claim.

## Age Discrimination

Calascibetta and Ruscitti also contend that Oak Park's termination of their employment violated ADEA (see 29 U.S.C. §623(a)). As in the retaliation context, a plaintiff seeking to prove such a claim may employ two different methods. One route is the ordinarily more difficult direct method, while the other involves the familiar and more frequently employed burden-shifting quadrille first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). In ADEA cases the latter path (sought to be traveled by both Calascibetta and Ruscitti) begins with the required showing that the employee (1) was a member of the protected age group--here at least 40 years old (29 U.S.C. §631(a)), (2) was performing his job satisfactorily, (3) suffered a materially adverse employment action and (4) was treated less favorably than younger but otherwise similarly

30

situated employees (see <u>Bennington v. Caterpillar Inc.</u>, 275 F.3d 654, 659 (7th Cir. 2001)). Both of them fail in that effort, because each falls at the fourth hurdle.[19]

## Calascibetta

In arguing that he was treated less favorably than a younger and similarly situated person, Calascibetta compares himself to Brian Jacks ("Jacks"), whom Oak Park hired as Supervisor of the Streets Division after Hirakawa was fired from that position (P. Mem. 16). But that proposed comparison is flawed for more than one reason.

First, Calascibetta was the Streets Division Crew Chief, not its Supervisor. That being so, he submits no valid reason for treating, as the required "similarly situated" employee, the person hired to replace some other employee rather than the person who replaced him (see <u>Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.</u>, 328 F.3d 309, 321 (7th Cir. 2003)). Calascibetta offers, as a lame "justification" for relying on such an indirect comparison, the claim that he was "in line" for the Supervisor position (P. Mem. 16). Even if that were true (but on that score see n.20), there is no authority for the notion that Calascibetta's being "in line" for the Supervisor

---

[19] That failure makes it unnecessary to analyze (1) whether the other prima facie components have been satisfied or (2) whether Oak Park's stated reasons for termination were pretextual.

position would make Jacks the proper comparator. Moreover, that untested notion could not help Calascibetta, for there is no evidence that he was in fact "in line"--just his own inadmissible naked assertion.[20]

Though it is scarcely necessary to heap Pelion upon Ossa, Calascibetta also has not tendered the requisite evidence as to Jacks' age, prior experience or qualifications for the job. To satisfy the "similarly situated" element, a plaintiff must submit admissible evidence that he is in fact comparable--similarly situated as to performance, qualifications and conduct--to the asserted comparator (Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000)). Here Calascibetta's unsubstantiated and skeletal claim that Jacks is "under 40 years of age" and had "less public works experience" than Calascibetta (see P. Add.St. ¶9) just does not cut it (see Balderston, 328 F.3d at 322).

So the only proper comparison is to Vetro, the person who replaced Calascibetta as Crew Chief. In that respect, however, Calascibetta admits that he is younger, not older, than Vetro (P.

---

[20] And as a third strike (though none is needed), how could Calascibetta have been "in line" for the Supervisor job when the position didn't even become available, via Hirakawa's termination, until the day that Calascibetta was himself fired (OP St. ¶¶171, 179)? Or more poignantly, it seems the height of irony for Calascibetta to label himself as next "in line" for a better job that opened up on the day that both the incumbent and Calascibetta were fired as part of the total housecleaning that came out of the investigation of the highly troubled Streets Division--talk about bootstrapping!

R.St. ¶207). In sum, Calascibetta indisputably fails to establish his prima facie case of age discrimination. This Court recommends the with-prejudice dismissal of that claim.

## Ruscitti

Like Calascibetta, Ruscitti also fails to satisfy the fourth element of his prima facie case. In this case Ruscitti, 41 years old when he was fired, points to Otters as his proposed comparator. Ruscitti urges that Otters was 38 years old at the time and that he too engaged in at least some of the sorts of abuse of co-workers of which Ruscitti was accused, but that Otters nevertheless kept his job (P. Mem. 16-18).

That argument loses for a reason different from--but just as conclusive as--the one that defeated Calascibetta. Even on the supposition that Otters may have engaged in a level of misfeasance that would suffice to render him "similarly situated" to Ruscitti, under the circumstances of this case the three-year age gap between Otters and Ruscitti is fatal to Ruscitti's ADEA claim. In this Circuit the comparator must be "substantially younger," not merely "younger," than the plaintiff (Radue, 219 F.3d at 619) (emphasis added)). And "substantially" means that the difference in ages must be at least ten years (id., Hoffmann v. Primedia Special Interest Publ'ns, 217 F.3d 522, 524 (7th Cir. 2000) and other cases cited in both those opinions). Any gap less than ten years is "presumptively insubstantial," so that a

33

plaintiff in such a situation can prevail only by adducing additional evidence that the employer considered his or her age as a factor in the employment decision (Hoffmann, id. (emphasis added)).

In brief, Ruscitti's three year age differential is far below the presumptive standard,[21] and there is no evidence at all that either Wiggins or Spataro considered his age to be significant in their decision to terminate him. That being so, Ruscitti too has failed to satisfy the fourth element of a prima facie ADEA case. As with Calascibetta, this Court recommends the dismissal of that claim with prejudice.

## Hostile Working Environment

That leaves for consideration only Rybacki's hostile working environment claim. To survive summary judgment on that claim, he must at least identify genuine issues of material fact as to (1) his having been subject to unwelcome harassment, (2) such harassment having been due to his protected status, (3) such harassment having been so severe or pervasive as to alter the conditions of his work environment by creating a hostile or abusive situation and (4) there being a basis for employer liability (Williams v. Waste Mgmt. of Ill., 361 F.3d 1021, 1029

---

[21] Differences as great as seven or even 9-1/2 years have been found insufficient to meet that standard (see Radue, 219 F.3d at 619).

34

(7th Cir. 2004)).

With the facts being viewed in the light most favorable to Rybacki, there is evidence that he was subjected to a considerable array of troubling conduct: His machinery was vandalized, his clean-up time was shortened, his bathroom usage was publicly monitored and he was assigned to work that aggravated his back condition. Even so, it is unnecessary to decide whether that conduct was sufficiently "severe and pervasive," for Rybacki fails to present the additionally required evidence that such treatment was due to any protected status he might enjoy.

In that respect the category on which the Rybacki memorandum focuses is his age. This opinion will assume arguendo, as our Court of Appeals has done in some cases, that such claims are cognizable under ADEA (though that court has yet to decide the issue directly: Racicot v. Wal-Mart Stores, Inc., 414 F.3d 675, 678 (7th Cir. 2005)). But even on that assumption, Rybacki has not presented enough admissible evidence to avert summary judgment.

For example, Rybacki's claim that co-workers referred to him as "old man" and "grandpa" might arguably support an alleged link between the treatment that he suffered and his age. But neither of his LR 56.1 submissions identifies any admissible record

evidence of such labeling.[22] Even the submitted excerpts from Rybacki's own deposition and his affidavit make no mention of any such references to Rybacki, though his deposition does include a statement that Vetro referred to one co-worker as a "fat old man" (App. III, Rybacki Aff. ¶1-11; App. I and Supplementary App., Rybacki Dep. 17-32, 69-72, 97-116, 125-52, 169-72, 219, 273-80). And the only other mention of that type comes in Rybacki's statement during his Hirakawa interview that a different co-worker was referred to as an "old man" who "should retire" (see P. Ex. 33, D 000898). But just as one swallow does not a summer make,[23] isolated remarks like these--remarks, moreover, directed toward a third person and not Rybacki himself--are not enough to establish a genuine question of material fact as to whether Rybacki's harassment was due to his protected status (see Smith v. Ne. Ill. Univ., 388 F.3d 559, 566-67 (7th Cir. 2004)).

Apart from that, Rybacki refers to two matters that purportedly might implicate age as a factor in his victimization: He was required to ask permission before taking a bathroom break, and Oak Park required him to get a physical examination. While

---

[22] Even though Oak Park noted the same references in its own memoranda (OP Mem. 23; OP R. Mem. 21) and referred to the record, those record citations provide no support for that claim.

[23] Though Aristotle originally spoke of "spring" rather than "summer" in his Nicomachean Ethics, most who have borrowed and repeated the aphorism since then (including Cervantes in Don Quixote) have changed the season--but not the thought.

Oak Park offers no explanation for the somewhat bizarre bathroom restriction, nothing about it is probative of age-related animus--and Rybacki's ipse dixit statement that the measure was "clearly based on Rybacki's status as...an older employee" (P. Mem. 20) does not make it so. Similarly, the mere requirement of a physical exam is too slim a reed to support a reasonable inference of age-related animus.

Thus quite apart from any question whether the treatment of which Rybacki complains qualified as "severe and pervasive" in the legal sense, any effort to link it to his age (let alone any other protected status) would be overly attenuated. Hence this Court finds that Rybacki's claim based on an assertedly hostile work environment also does not withstand summary judgment, and it also recommends the dismissal of that claim with prejudice.

## Conclusion

As stated at the outset, all claims other than Graziano's are before colleagues of this Court for ultimate resolution, so that what has been said here as to those claims is by way of recommendations for their consideration. To that end it is submitted that Oak Park's motion for summary judgment should be viewed as well taken as to (1) Ruscitti's claims of retaliation, national origin discrimination and age discrimination, (2) Calascibetta's claims of retaliation and age discrimination, and (3) Rybacki's claims of retaliation, national origin

discrimination and age discrimination, as well as his hostile working environment claim.

As for Graziano, Oak Park's motion for summary judgment as to his claim of retaliation is denied. Graziano's case is set for a status hearing at 8:45 a.m. December 7, 2005 to discuss the procedure and timing looking to trial.

Milton I. Shadur
Senior United States District Judge

Date: November 28, 2005

## Appendix 1

Each of the four plaintiffs referred to in this opinion (as
well as a fifth, Raymond Washington ("Washington")) originally
filed a separate action against Oak Park (Graziano in Case No.
03 C 4563, Ruscitti in Case No. 03 C 4569, Washington in Case No.
03 C 4565 and Calascibetta in Case No. 03 C 4566), each of which
was assigned to a different District Judge. Soon thereafter,
however, the four higher-numbered cases were provisionally
assigned to this Court on "relatedness" grounds under LR 40.4.

At the conclusion of pretrial discovery proceedings, this
Court determined that the cases were not in the end "susceptible
of disposition in a single proceeding" as required by LR
40.4(b)(4) and the cases were returned to their original dockets.
Nevertheless this Court (by agreement of the other District
Judges involved) retained responsibility for passing judgment on
Oak Park's summary judgment motion, but only as to those claims
of retaliation and national origin discrimination under Title VII
and age discrimination under ADEA that were common to all the
cases. This opinion has not then addressed (a) any of the claims
raised in Washington's complaint, (b) Calascibetta's defamation
claims against Village Attorney Raymond Heise and Assistant
Village Manager M. Ray Wiggins and (c) Rybacki's claims under
ADA.

## II.  THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT PRECLUDES SUMMARY JUDGMENT IN FAVOR OF THE VILLAGE

### A.  Defendant's Statement of Facts Should Be Deemed Admitted In Its Entirety.

Local Rule 56.1(b) requires that a party opposing summary judgment respond to the movant's statement of facts by filing a concise response "to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(A)-(B). These requirements are "strictly enforced" and a "failure to properly meet the requirements to deny a moving party's statement of facts results in the moving party's version of the facts being deemed admitted." Jackson v. Int'l Bhd. of Teamsters, Local Union No. 705, No. 02-C-2745, 2004 U.S. Dist. LEXIS 14625 (N.D. Ill. July 29, 2004), aff'd, 2005 U.S. App. LEXIS 4366 (7th Cir. Mar. 9, 2005) (copy attached at App. II, Tab. 81), citing LR 56.1(b)(3)(B).

Of the 243 statements of fact submitted by the Village pursuant to Local Rule 56.1(a)(3), 71 are "stipulated to" by all Plaintiffs. (Pls.' 56.1 Resp. ¶¶ 1-25, 28-29, 30-33, 34-37, 40, 41, 53, 54, 59, 64-66, 69, 80, 82, 83, 85, 106, 107, 128-130, 136, 143, 149-152, 154-157, 169-171, 175, 181-182, 242, 243).[2] An additional 54 statements are stipulated to by one Plaintiff with no denial or other response by the remaining Plaintiffs and, therefore, should be deemed admitted as to all four Plaintiffs. (Pls.' 56.1 Resp. ¶¶ 42-49, 120-127, 137, 173, 178, 187-189, 196-205, 207-220, 225, 231-232, 234-235, 238-240). See McGuire v. United Postal Serv., 152 F.3d 673, 675 (7th Cir. 1998) ("an answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.")

---

[2]  Citations to the Village's Rule 56.1 Statement of Undisputed Facts are indicated herein as ("Def.'s. SF ¶ ___"); Plaintiffs' Rule 56.1(b)(3)(B) Statement of Facts is cited herein at ("Pls.' SF ¶ ___"); Plaintiffs' Response Pursuant to Rule 56.1(b)(3)(A) is cited as ("Pls.' 56.1 Resp. ¶ ___"); and Defendant's Response to Plaintiffs' 56.1 (b)(3)(B) Statement is cited as ("Def.'s 56.1 Resp. ¶ ___").

3

APPENDIX 2

Of the remaining 118 statements of fact purportedly contested by Plaintiffs, closer scrutiny reveals that the overwhelming majority should be deemed admitted due to Plaintiffs' (1) failure to refute the asserted fact in part or in its entirety (Pls.' 56.1 Resp. ¶¶ 26, 27, 38, 39, 50, 51, 55, 56-58, 60-62, 63, 67, 68, 70-79, 81, 84, 86-99, 101-105, 108-124, 133-135, 138, 139, 140-142, 144, 146, 148, 153, 158-168, 172, 174, 176, 177, 179, 180, 183-186, 190-193, 195, 206, 223, 226-230, 236, 237); (2) assertion of purely argumentative denials and extraneous information and argument (Pls.' 56.1 Resp. ¶¶ 27, 34-36, 38, 39, 42-49, 50, 51, 55-58, 60-62, 67, 68, 71-73, 74, 76-79, 81, 84, 86-88, 90, 92, 93-99, 101-105, 112, 117-119, 132-133, 135, 139, 141, 144-146, 148, 153, 158-168, 172, 174, 176, 177, 179, 180, 183-186, 190-192, 194, 206, 221-224, 241); and/or (3) failure to support their denial with "specific references to the affidavits, parts of the record [or] other supporting materials relied upon." (Pls.' 56.1 Resp. ¶¶ 38, 61, 67, 71, 76, 78, 79, 84 97, 109, 110, 114, 118, 131, 139, 141, 144, 159, 165, 166, 168, 184, 194, 236). See LR 56.1(b)(3)(A); see also Guzzo v. Northeast Illinois Regional Railroad Corp., No. 94-C-5813, 1996 U.S. Dist. LEXIS 3167 at *2 (N.D. Ill. Mar. 15, 1996) (copy attached at Supp. App. 10) (holding that including legal arguments is "wholly improper"); McGuire, 152 F.3d at 675; Malec v. Sanford, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("factual allegations not properly supported by citation to the record are nullities"). For these reasons, the facts asserted in the Village's Rule 56.1(a)(3) Statement of Material Undisputed Facts should be accepted as true. See Valenti v. Qulex, Inc., 970 F.2d 363, 369 (7th Cir. 1992).

## B. Plaintiffs' Unsupported and Conclusory Assertions, Argumentative Denials, Speculation, and Self-Contradiction Do Not Create A Factual Dispute.

As set forth in Defendant's Response to Plaintiffs' Rule 56.1 Statement of Facts, Plaintiffs attempt to generate a material factual dispute by relying on unsupported and immaterial assertions, misconstruing the record, asserting purely argumentative denials of facts plainly in

4